# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRUSTEES OF THE WASHINGTON STATE PLUMBING AND PIPEFITTING INDUSTRY PENSION PLAN, in their capacity as fiduciaries of the fund, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| TREMONT PARTNERS, INC., | ) |
| | ) |
| Defendant. | ) |

**CIVIL ACTION NO.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, the Trustees (the "Trustees") of the Washington State Plumbing and Pipefitting Industry Pension Plan (the "Plan"), in their capacities as fiduciaries of the Plan, allege the following on behalf of the Plan and all others similarly situated:

## BACKGROUND

1.      This class action is brought pursuant to the Employee Retirement Income Security Act, *as amended*, 29 U.S.C. § 1001 *et seq.* ("ERISA"), seeking relief, including restitution, for the Plan and similarly-situated ERISA plans (the "Class Members" or the "ERISA Plans") that, as a result of imprudent and unlawful conduct by Defendant (as defined below), lost substantial amounts of money through the fraudulent investment scheme orchestrated by Bernard L. Madoff ("Madoff") and Bernard L. Madoff Investment Securities, LLC ("Madoff Securities").

2.      This case arises from a massive, fraudulent scheme that was orchestrated by Madoff through his investment firm, Madoff Securities, and others.  The scheme was facilitated by Defendant Tremont Partners, Inc. ("Tremont"), who, in breach of its fiduciary duties owed to

the Plan and to the other ERISA Plans, caused and permitted the ERISA Plans' assets to be invested with Madoff Securities. The fraudulent investment scheme carried out by Madoff and Madoff Securities is well-documented as the largest Ponzi scheme in history.

3.    Defendant facilitated Madoff's fraud by investing and allowing billions of dollars to be invested in Madoff and Madoff Securities without performing adequate due diligence, despite the existence of numerous warning signs. These red flags included, among other things, abnormally high and stable investment results reportedly obtained by Madoff regardless of market conditions, the fact that Madoff Securities was audited by a small obscure accounting firm with no capacity to audit an entity of the apparent size and complexity of Madoff Securities, as well as inconsistencies between publicly available financial information and the amount of money that Madoff managed for clients.

4.    On December 10, 2008, Madoff informed his sons that his investment advisory business, Madoff Securities, was a complete fraud. Madoff stated that he was "finished," that he had "absolutely nothing," and that "it's all just one big lie." He confessed that he had been running "basically, a giant Ponzi scheme." Madoff admitted that the business was insolvent and that it had been for years. Madoff estimated the losses from this fraud to be approximately $50 billion.

5.    On December 11, 2008, Madoff's fraud was exposed to the world. The Securities and Exchange Commission ("SEC") charged both Madoff and Madoff Securities with securities fraud. At the time of his arrest, Madoff was quoted as saying, "there is no explanation" for what had happened and that he "paid investors with money that wasn't there."

6.    On March 12, 2009, Madoff pled guilty to 11 counts of fraud, money laundering, perjury, and theft. In connection with his guilty plea, Madoff admitted that "for many years up

until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC, which was located here in Manhattan, New York at 885 Third Avenue." On June 29, 2009, Madoff was sentenced by United States District Court Judge Denny Chin to 150 years in prison for his crimes.

7.    The Plan is a multiemployer pension plan established for the benefit of union-represented laborers and their families.

8.    As further described below, Defendant were fiduciaries with respect to the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21).

9.    Tremont served as an investment manager of the Plan during the Class Period (defined below) and was responsible for managing and directing the investment of certain assets of the Plan.

10.    Specifically, until April 2005, Tremont served as investment manager of a separate account established for the Plan. On April 8, 2005, Tremont created a commingled investment vehicle known as the Tremont Core Strategies Portfolio, Ltd. (the "Tremont Core Strategies Fund"), for which Tremont served as investment manager. At all relevant times, the assets of the Tremont Core Strategies Fund were "plan assets," for purposes of ERISA's fiduciary responsibility and prohibited transaction rules.

11.    Under ERISA, Defendant owed certain fiduciary duties to the ERISA Plans that invested in limited partnership interests in the Tremont Core Strategies Fund and/or for which Tremont served as investment manager of a separate account. Among these duties was an obligation to manage the Plans' assets prudently, loyally and in the best interests of plan participants.

12.    As an ERISA fiduciary, Defendant breached its fiduciary obligations owed to the

ERISA Plans and, directly or indirectly, caused the ERISA Plans to suffer substantial losses through Madoff-related investments. These losses were easily preventable. Had Defendant conducted due diligence, it would have detected the obvious red flags surrounding Madoff and Madoff Securities, including, without limitation, the following:

    (a)    the fact that Madoff Securities' returns were abnormally steady, with very little volatility, including only five months of negative returns in the past 12 years;

    (b)    the inability of other firms using a "split-strike conversion" strategy to generate returns comparable to those allegedly earned by Madoff Securities;

    (c)    despite the size and scale of Madoff Securities, its auditors, Friehling & Horwitz, consisted of one small office in Rockland County, New York, with just three employees;

    (d)    in 1999 and 2005, one of Madoff's competitors, Harry Markopolos, wrote letters to the SEC describing in detail how Madoff Securities was a fraudulent Ponzi scheme;

    (e)    monthly account statements sent to investors of Madoff Securities did not support the returns supposedly being earned;

    (f)    Madoff's operation had no independent custodian or independent third party who could verify the existence and value of Madoff's investments or transactions;

    (g)    Madoff maintained a shroud of secrecy over his operations;

(h)     Madoff's purported investment strategy bore a strikingly low correlation to the market; and

(i)     Trading volumes reflected in accounts were vastly in excess of actually reported trading volumes.

13.     As Eric Weber, managing director of Wall Street investment bank Freeman & Co. explained:

> [A] diligent investment adviser would have quickly become suspicious of Madoff and taken extra precautions. The adviser would have visited Madoff's auditor's office, quizzing the auditor and spot-checking the audit report data; arranged to watch Madoff's staff conduct trades; asked other financial experts if they could duplicate the returns Madoff claimed to be achieving; and independently verified Madoff actually made the trades he claimed. The careful investment managers walked away.

*See* Stan Linhorst, *How Warning Signs Eluded Bernard Madoff's Man in Syracuse*, The Post Standard (March 29, 2009), *available at:*

http://www.syracuse.com/news/index.ssf/2009/03/how_warning_signs_eluded_berna.html.

14.     Tremont accepted substantial investment management fees in connection with the capital invested on behalf of the ERISA Plans. These fees were paid so that Tremont would diligently perform its fiduciary duties, including the vetting of suitable investment managers, assembling a diversified group of investments, following a professional investment strategy, and conducting ongoing due diligence. However, Defendant failed to perform any of these duties and, accordingly, breached its fiduciary duties owed to the ERISA Plans. Instead, Defendant continued to invest millions of dollars with Madoff on behalf of the ERISA Plans, in clear violation of its duties under the law.

15.     As described below, Defendant also suffered from conflicts of interest that disincentivized it to adequately perform its fiduciary functions. Defendant thus had cash

incentives to "turn a blind eye" to the imprudence of the Madoff-related investments, at the risk of losses to the ERISA Plans.

16.    As a direct result of Defendant's fiduciary breaches, the Plan and the other Class Members suffered significant losses.

17.    ERISA §§ 409 and 502 authorize ERISA plan fiduciaries, such as the Plaintiffs, to sue for losses suffered by their plans as a result of breaches of fiduciary duty, for the purpose of obtaining relief on behalf their plans.

18.    Accordingly, under Fed. R. Civ. P. 23, Plaintiffs bring this action on behalf of the Plan and on behalf of similarly situated ERISA plans that were subject to, and affected by, Defendant's conduct in the same manner and with the same debilitating effect.  Plaintiffs allege that Defendant, having undertaken a fiduciary role with respect to the Plan and other members of the Class, breached its duties of prudence, loyalty, and exclusive purpose under ERISA § 404(a) as described herein.

19.    Plaintiffs seek to recover losses and other equitable relief on behalf of the ERISA Plans, for which Defendant is liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

21.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, Defendant resides or may be found in this district and/or the alleged breach occurred in this district.

## PARTIES

22.    Plaintiffs are the administrators and named fiduciaries of the Plan.  The Plan is

a multi-employer plan within the meaning of ERISA § 3(37), 29 U.S.C. §1002(3)(37), the sole purpose of which is to provide pension benefits to eligible members of the Washington State Plumbing & Pipefitting Industry union on whose behalf participating employers contribute to the Plan.

23.     Defendant Tremont, at all relevant times, was a corporation organized under the laws of the State of Connecticut and maintained its principal place of business at 555 Theodore Fremd Avenue, Rye, New York. At all relevant times, Tremont was a subsidiary of Tremont Group Holdings, Inc., formerly known as Tremont Advisers, Inc. and Tremont Capital Management, Inc. Tremont, which was founded by Sandra Manzke in 1984, began investing with Madoff in the mid-1980s. Robert Schulman became Tremont's President and COO in 1994 and co-CEO with Manzke in 2000. After Manzke left Tremont in 2005, Robert Schulman became the sole CEO of Tremont. Throughout this time, Tremont's relationship with Madoff grew, as Tremont invested nearly $3.3 billion of its clients' assets with Madoff.

## DEFENDANT'S FIDUCIARY STATUS

24.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1) but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions.

25.     ERISA § 3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so. . ."

26.     During the relevant time period, Defendant performed fiduciary functions under

this standard and thereby acted as fiduciaries under ERISA.

27.    Tremont was a fiduciary of the ERISA Plans in that (a) within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21), it exercised authority or control respecting management or disposition of a portion of the ERISA Plans' assets; and (b) it was an investment manager, within the meaning of Section 3(38) of ERISA, 29 U.S.C. § 1002(38), which by definition is a fiduciary.

28.    The Board of Directors of the Tremont Core Strategies Fund delegated management of the fund's assets to Tremont.

29.    The Offering Memorandum for the Tremont Core Strategies Fund stated:

> Investment in the Fund will be generally open to employee benefit plans and other funds subject to ERISA...[c]onsequently, the assets of the Fund will constitute "plan assets" for purposes of ERISA and will need to managed to comply with ERISA's fiduciary rules...

30.    Tremont, as the investment manager for the Tremont Core Strategies Fund, had overall responsibility for selecting the Fund's managers and determining what portion of the Fund's assets each manager should be allocated.

31.    Tremont exercised similar authority or control over ERISA plan assets it managed through separate accounts established for and under the Plan and other ERISA plans, as well as through other commingled funds, the assets of which constituted ERISA plan assets.

## CLASS ACTION ALLEGATIONS

32.    On behalf of the Plan, Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed Class consisting of the following:

> All plans governed by ERISA that invested in any comingled fund or separate account managed by Tremont, the assets of which constituted ERISA plan assets, including, without limitation, the

Tremont Core Strategies Fund, and suffered losses as a result of Tremont's investment of plan assets in any Madoff-related investment.

Excluded from the Class are (i) Defendant; (ii) all officers, directors, principals, and partners of Defendant and of Defendant' parents, subsidiaries, or affiliates, at all relevant times; (iii) members of the immediate family of any of the foregoing excluded parties; (iv) the legal representatives, heirs, successors, and assigns of any of the foregoing excluded parties; and (v) any entity in which any of the foregoing excluded parties has or had a controlling interest.

33.    The Class is so numerous that joinder of all members is impracticable.

34.    The Plan's claims are typical of the claims of all Class Members, as all Class Members have been similarly affected by Defendant's conduct.

35.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in complex ERISA and securities class action litigation.

36.    Certification is appropriate under Rule 23(b)(3) because common questions of law and fact exist as to all Class Members and predominate over any questions solely affecting individual Class Members and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action.  Among the questions of law and fact common to the Class are:

(a)    whether Defendant owed fiduciary duties to the ERISA Plans;

(b)    whether Defendant violated ERISA by failing to prudently manage the assets of the ERISA Plans;

(c)    whether Defendant violated ERISA by failing to act prudently and solely in the interests of the ERISA Plans and their participants and beneficiaries;

(d)    when Defendant became aware or should have been aware of the imprudence of the Madoff-related investments;

(e)    whether Defendant violated its ERISA-mandated duties; and

(f)    whether the ERISA Plans have sustained losses and, if so, the proper measure of such losses.

## SUBSTANTIVE ALLEGATIONS

**A.    Madoff's $65 Billion Ponzi Scheme**

37.    Madoff is a former chairman of the Board of Directors of the NASDAQ stock market. He founded Madoff Securities in 1960 and was its chairman until December 11, 2008, when he was charged with committing what may be the largest fraudulent investment scheme ever perpetrated.

38.    Madoff Securities is a broker-dealer and an investment advisor, registered with the SEC. The firm engaged in three distinct operations: (1) investment advisor services; (2) market making services; and (3) proprietary trading. According to its Form ADV filing with the SEC on January 2008, Madoff Securities had approximately $17 billion in assets under management.

39.    Madoff started his firm in 1960 with an initial investment of $5,000 that he reportedly earned from working as a lifeguard and installing sprinklers. At first, the firm "made markets" via the National Quotation Bureau's Pink Sheets. In order to compete with other firms that were members of the New York Stock Exchange, the firm began to actively use information technology to disseminate its quotes. The technology that the firm helped to develop eventually became the NASDAQ.

40.    Madoff Securities lured investors with a promise of a risk-reducing strategy that would generate consistently higher returns than those available through other investment vehicles.

41.     Madoff independently conducted his investment advisory service business apart from his company's other services from a completely separate floor in Madoff Securities' New York offices. Madoff was secretive about the advisory business even when discussing it with other employees of Madoff Securities. It was through this investment advisory services business that Madoff conducted his massive Ponzi scheme.

42.     The capital that Madoff used to facilitate the fraud was raised largely through "feeder funds," investment vehicles that acted as intermediaries between Madoff Securities and investors. Many feeder funds were created by outside advisory firms that marketed the Madoff funds to high net-worth individuals and institutional investors.

43.     Madoff and his firm managed billions of dollars for investors using a purported specialized investment strategy known as a "split-strike or conversion" strategy. Madoff purportedly took large positions in a basket of large cap stocks that approximated the S&P 100 Index, then sold call options and purchased put options against the long stock positions. This strategy was supposed to limit downside exposure by providing a partial hedge, while providing consistent returns to investors. Based on this strategy, Madoff and his firm had apparently produced an exceptional, though phantom, track record of returns for investors.

44.     Madoff claimed that his purported investment strategy produced consistent gains, even in declining markets. Indeed, as details of the fraud emerged, account statements issued to Madoff's clients were examined which notably revealed modest, but steady, gains each month regardless of market direction.

45.     Madoff had a suspiciously successful track record year after year, with returns that were unusually and unrealistically reliable. A hedge fund run by Madoff, which described its strategy as focused on shares in the Standard & Poor's 100-stock index, averaged a 10.55%

annual return over the past 17 years.

46.     Madoff was able to carry out the scheme for many years. However, when the financial crisis became severe in the fall of 2008, client redemptions increased substantially. In early December 2008, Madoff's Ponzi scheme collapsed. Investors in Madoff Securities and the general public soon learned that Madoff's investment strategy was an enormous Ponzi scheme. Incoming client money was, often times, never invested at all, but used simply to fund redemptions to existing clients.

47.     On December 9, 2008, Madoff advised one of his senior employees that investors were seeking some $7 billion in redemption for which Madoff was struggling to secure liquidity. Madoff knew that he could never match incoming client investments with the amount of the requested redemptions.

48.     On December 10, 2008, Madoff informed his senior employees, including his sons, that his investment advisory business was a "just one big lie." He confirmed he had been running "basically, a giant Ponzi scheme." Madoff admitted that the business was insolvent and that it had been for years. Madoff also stated that he estimated the losses from this fraud to be approximately $50 billion; this figure was later raised to $65 billion.

49.     On December 11, 2008, Madoff's fraud was exposed. The SEC filed a civil action charging both Madoff and Madoff Securities with securities fraud and seeking emergency relief to halt the fraudulent conduct. *SEC v. Madoff*, No 08 Civ. 10791 (S.D.N.Y.)

50.     Also on December 11, 2008, criminal charges were filed against Madoff. When he was arrested by federal authorities, Madoff was quoted as saying, "there is no explanation" for what happened and that he "paid investors with money that wasn't there."

51.     By order dated December 15, 2008, the Court appointed a trustee to preside over

the liquidation of Madoff's business and stayed all further claims against Madoff Securities.

52.    On March 12, 2009, Madoff pled guilty to 11 counts of fraud, money laundering, perjury and theft, crimes which carry maximum terms totaling 150 years. In connection with his guilty plea, Madoff admitted that "for many years up until my arrest on December 11, 2008, I operated a Ponzi scheme through the investment advisory side of my business, Bernard L. Madoff Securities LLC, which was located here in Manhattan, New York at 885 Third Avenue."

53.    On June 29, 2009, Madoff was sentenced by United States District Court Judge Denny Chin to 150 in prison for his abhorrent crimes.

**B.    The Plan Entrusted Substantial Assets with Tremont**

54.    The Plan operates for the sole and exclusive benefit of its participants and their beneficiaries.

55.    As named fiduciaries of the Plan, the plaintiff Trustees were authorized to designate an investment manager for the purpose of investing all or a part of the Plan's assets.

56.    Following a due diligence investigation, the Plan retained Tremont for the purpose of managing a portion of plan assets.

57.    Until approximately May 2005, Tremont managed Plan assets through a separate account established for the Plan. For its services, Tremont received an annual management fee of 1.50%. The investment management agreement provided that Tremont would serve as the Plan's appointed investment manager to invest and reinvest the assets of the separate account. Tremont accepted this appointment and expressly acknowledged its status as an ERISA fiduciary with respect to Plan assets invested in the separate account.

58.    Upon information and belief, Tremont also entered into substantially similar investment agreements with other ERISA plans concerning its management of separate accounts on behalf of such plans.

59.     On or about April 8, 2005, Tremont created the Tremont Core Strategies Fund, as part of the "Tremont Plan Fund Series." The Tremont Core Strategies Fund principally offered its shares to ERISA plans. Upon information and belief, Tremont also created other comingled funds, the assets of which constituted ERISA plan assets.

60.     The Plan then invested in the Tremont Core Strategies Fund.

61.     Tremont served investment manager for the Tremont Core Strategies Fund. For its services, Tremont collected a management fee of 1.25% per year plus expenses, up to an aggregate maximum of 1.50% per year.

62.     As investment manager of the Tremont Core Strategies Fund and as investment manager of separate accounts for ERISA Plans, Tremont was responsible for managing and directing the investment of ERISA plan assets and was bound by ERISA's fiduciary standards.

63.     The October 1, 2005 Information Memorandum (the "Memorandum") for the Tremont Core Strategies Fund ("Oct. Mem.") stated that the fund's objective was to "seek to (i) achieve long-term capital appreciation and (ii) consistently generate positive returns irrespective of stock market volatility or directions, while focusing on preservation of capital." Oct. Mem. at 2.

64.     Tremont represented that it "collects, analyzes and evaluates information regarding the personnel, history and background, and the investment styles, strategies and performance of professional investment management firms." *Id*. at 3.

65.     The Memorandum stated that, in selecting the underlying funds in which the invest the assets of the Tremont Core Strategies Fund, Tremont "considers the attributes of the Underlying Funds individually and collectively" and "seeks to optimize the portfolio by balancing the expected volatilities and sensitivities of the Underlying Funds in a manner that will

minimize the volatility of the Fund and maximize its return." *Id.* at 2.

66.    The Memorandum for the Tremont Core Strategies Fund coyly stated:

> The Fund attempts to accomplish [its] investment objective by investing the assets of the Fund with a diverse group of non-U.S. investment funds or similar vehicles (the "Underlying Funds") whose Managers employ a variety of "opportunistic" investment strategies.

*Id.* at 2.

67.    The "opportunistic" investment strategies were described as including long-short-term equity, hedging and arbitrage techniques in the equity, fixed income an currency markets; index arbitrage; interest rate arbitrage; convertible bond and warrant hedging; merger arbitrage; statistical long/short equity strategies; pairs trading; and investment in non-U.S. securities. *Id.* at 2.

68.    As described below, Tremont was bound by ERISA's fiduciary standards. As an ERISA fiduciary with respect to its management of the Tremont Core Strategies Fund and of other dedicated ERISA funds and separate accounts established by and for ERISA plans, Tremont was obligated to (a) conduct complete and proper due diligence regarding the funds' investments, including the managers that Tremont selected, (b) investigate any "red flags" or warning signs that the funds assets were imprudently invested, and (c) take appropriate and adequate action to safeguard the Plan's assets.

**C.    Tremont Invested Plan Assets with Madoff and Failed to Conduct Adequate Due Diligence, Recognize Warning Signs and/or Act Upon Such Warning Signs**

69.    Rather than conduct adequate due diligence and properly perform its duties as an ERISA fiduciary, Tremont conducted itself in a manner completely inconsistent with its fiduciary duties and entrusted a substantial portion of the ERISA Plans' assets with Madoff. Tremont invested ERISA plan assets with Madoff through the Tremont Core Strategies Fund and through

separately accounts and funds it managed on behalf of ERISA plans—despite the existence of numerous red flags.

70.     These red flags included, among other things, the abnormally high and stable positive investment results reportedly obtained by Madoff regardless of market condition, inconsistencies between Madoff Securities' publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients, and the fact that Madoff Securities was audited by a small, obscure accounting firm with no experience auditing entities of the apparent size and complexity of Madoff Securities.

71.     As a fiduciary, Defendant had a duty to prudently manage the ERISA Plans' assets for the sole and exclusive interest of the Plans' participants and beneficiaries, as set forth in Section 404(a) of ERISA, 29 U.S.C. §1104(a).

72.     Since at least 1992, there were various events that should have alerted Defendant to the riskiness of the investments with Madoff Securities and caused Defendant to take action to protect the ERISA Plans' assets.

73.     In 1992, the SEC filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people, promising returns of 13.5% to 20%.  The money was invested entirely with Madoff.  Although Madoff was not formally charged, Avellino and Bienes agreed to close their businesses and reimbursed their clients.

74.     Indeed, derivatives expert Harry Markopolos questioned Madoff's operation as early as May 1999, when he sent a letter to the SEC describing how Madoff could not have generated the returns he reported using the split-strike conversion strategy.  Markopolos encouraged the SEC to investigate Madoff.

75.    In May 2001, a prescient article entitled "Madoff Tops Charts: Skeptics Ask How" appeared in *MAR/Hedge*, a newsletter that reports on the hedge fund industry.    In the article, Michael Ocrant wrote:

> Those who question the consistency of the returns . . . include current and former traders, other money managers, consultants, quantitative analysts and fund-of-fund executives, many of whom are familiar with the so called split-strike conversion strategy used to manage the assets.
>
> ***************
>
> They noted that others who use or have used the strategy—described as buying a basket of stocks closely correlated to an index, while concurrently selling out-of-the-money call options on the index and buying out-of-the-money put options on the index—are known to have had nowhere near the same degree of success.
>
> ***************
>
> In addition, experts ask why no one has been able to duplicate similar returns using the strategy and why other firms on Wall Street haven't become aware of the fund and its strategy and traded against it, as has happened so often in other cases; why Madoff Securities is willing to earn commissions off the trades but has not set up a separate asset management division to offer hedge funds directly to investors and keep all the incentive fees for itself, or conversely, why it doesn't borrow the money from creditors, who are generally willing to provide leverage to a fully hedged portfolio of up to seven to one against capital at an interest rate of Libor-plus, and manage the funds on a proprietary basis.

76.    On May 27, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell; Bernie Madoff is so secretive, he even asks his investors to keep mum."    In the article, Erin Arvedlund wrote in pertinent part:

> The private accounts managed by Madoff "have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff run funds have never had a down year.    When Barron's asked Madoff how he accomplishes this, he says, 'It's a proprietary strategy.    I can't go into it in great detail.'"

\*       \*       \*

> [S]ome on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone. Three options strategists for major investment banks told Barron's they couldn't understand how Madoff churns out such numbers using this strategy.

\*       \*       \*

> Adding further mystery to Madoff's motives is the fact that he charges no fees for his money management service.

77.    In 2005, Markopolos sent a detailed 17-page memo directly to the SEC regarding Madoff's investment scheme.  The memo described 29 red flags which indicated that that Madoff was either running a Ponzi scheme or front running, placing favored orders before others when placing them in the market.  Markopolos identified 29 signs of suspicious activity in Madoff Securities, including:

> The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature... Why the need for such secrecy?  *If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry* (emphasis in original).

\*       \*       \*

> *Why would [Madoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?*  (emphasis in original)

\*       \*       \*

> *Madoff does not allow outside performance audits.* (emphasis in original).

78.    In 2007, hedge fund investment adviser Aksia LLC urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff and discovered several red flags, including:

(a)    Madoff's auditor, Friehling & Horwitz, operated out of a 13x18 foot location in New York and included one partner in his late 70s who lived in Florida, a secretary and one active accountant; and

(b)    Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers.

79.    On January 16, 2009, the *International Herald Tribune* reported:

> "It's a very strange set-up, since most prospectuses disclose the names of the actual portfolio managers," said Drago Indjic, a project manager at the Hedge Fund Center of the London Business School. "*If you've been in the industry, this doesn't pass the smell test.*"

80.    Defendant also knew or should have known that Madoff was both the custodian and broker/dealer of his managed accounts. It was unusual, if not unprecedented, for a hedge fund manager not to use an independent custodian or prime broker. All trading in the fund was through Madoff. All trade confirmations were generated by Madoff.

81.    Madoff Securities was supposedly technologically advanced but funds did not have electronic access to their accounts. This was because paper documentation provided Madoff with the ability to manufacture trade tickets purporting to confirm investment results that had not and were not occurring, and to falsify supporting documentation. This should have caused Defendant to question the legitimacy of Madoff's operation.

82.    Despite the size of Madoff's operation, it was audited by a very small accounting firm (with as few as three employees) named Friehling & Horowitz. Such a small firm would not be able to obtain sufficient evidential matter to support an audit opinion for an entity purportedly Madoff's size, even if Madoff was the only client.

83.    As *Pensions and Investment* reported on December 22, 2008:

"*There were a thousand red flags*. if you did the work. It didn't take much energy to reverse-engineer Madoff's track record and find that his split-strike conversion method just would not have worked in certain markets the way he said it did." said the chief executive of a large institutional hedge fund-of-funds firm who asked not to be identified.

*     *     *

Many observers agreed with another hedge fund-of-funds executive who said. on condition of anonymity: "Among serious people in the industry, (Mr.) Madoff was a joke. Some hedge fund problems are unknowable. Sowood (Capital Management LP) was unknowable.     Long-term Capital Management (LP) was unknowable.     Amaranth (Advisors LLC) was somewhat knowable. Madoff was very knowable. *All the trouble signs were there, written in red*."

84.     Numerous investment advisors and professionals who thoroughly looked into Madoff's trading were unable to reconcile investors' account statements with the reported returns. In a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying. "Our due diligence. which got into both account statements of [Madoff's] customers, and the audited statements of Madoff Securities, which he filed with the SEC, made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

85.     As the SEC Inspector General reported, several private entities concluded that Madoff's investment services were unsavory given the multitude of red flags:

The OIG also found that numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was unwise. Specifically. Madoff's description of both his equity and options trading practices immediately led to suspicions about Madoff's operations. With respect to his purported trading strategy, many simply did not believe that it was possible for Madoff to achieve his returns using a strategy described by some industry leaders as common and

20

unsophisticated. In addition, there was a great deal of suspicion about Madoff's purported options trading, with several entities not believing that Madoff could be trading options in such high volumes where there was no evidence that any counterparties had been trading options with Madoff.   The private entities' conclusions were drawn from the same "red flags" in Madoff's operations that the SEC considered in its examinations and investigations, but ultimately dismissed.

*See* SEC Inspector General's Investigation of Failure of the SEC to Uncover Bernard Madoff's

Ponzi Scheme, at p. 25.

86.     The report discussed how one CEO conducted due diligence and decided to steer

clear of Madoff:

> The CEO was suspicious and obtained copies of an investor's last few account statements from Madoff Securities, and compared a sample of trades on the statements with what was actually going on in the markets on the day Madoff was trading. The CEO stated he found this "pattern which really seemed weird where the – where the purchases were all at or close to the lows of the day and the sales were at or close to the highs of the day," noting that "of course, nobody can do that." His "suspicion was that the fact pattern that [he] had seen seemed consistent with a Ponzi scheme." The CEO said he "didn't conclude that that was the case, but [he] certainly thought there was enough of a risk that that was the case that, you know, [he] certainly wouldn't touch it with a 10-foot pole."

*Id*. at 414.

87.     After investigating Madoff's operations, Société Générale's due diligence team

opted to internally blacklist Madoff and advise wealthy clients at its private banks against

investing with him.  Indeed, as Drago Indjic, a project manager at the Hedge Fund Center of the

London Business School noted, many European hedge fund companies saw the tell-tale signs of

a Ponzi scheme all along:

> Madoff did not pass due diligence for many European hedge fund companies . . . Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is Ponzi scheme.

Nelson D. Schwartz, *European Banks Tally Losses Linked to Fraud*, New York Times, Dec. 17, 2008.

88.    In July 2008, the managers of the Fort Worth Employees' Retirement Fund heeded the advice of Albourne Partners, a London due diligence firm, and liquidated its $10 million stake in the Rye Select Broad Market Fund, a fund that was entirely invested with Madoff. According to a December 31, 2008 article in BusinessWeek, Albourne Partners had "long-standing concerns about Madoff's trading strategy and consistent returns" and "had urged clients for nearly a decade to avoid affiliate funds such as Rye." *See* Matthew Goldstein, *The Madoff Case Could Reel in Former Investors*, Dec. 31, 2008, BusinessWeek.

89.    Tremont was clearly on notice that investing ERISA plan assets with Madoff was imprudent.    For example, Rogerscasey, a domestic registered investment adviser providing investment consulting services globally, issued several adverse ratings of Madoff-related feeder funds such as Fairfield Greenwich and Tremont dating as far back as 2002, "based largely on concerns about the integrity of the Madoff structure." A Rogerscasey newsletter published in December 2008 enumerates the severe warnings it issued regarding Madoff:

- June 4, 2002 – We are exceedingly negative on Madoff as a hedge fund.

- November 21, 2002 – [Tremont's] largest exposure . . . is to Madoff . . . where Tremont receives limited independent third-party transparency. . . . The only third party, independent transparency that Madoff provides to its investors is being 100% in cash at the end of each year, so that its auditor can verify with Madoff's banker . . . that the cash is real. Madoff has no prime broker and no plan administrator. It acts as a broker/dealer, self-clears, and sends its own trade confirms to its investors all of whom have "cash" accounts.

- February 27, 2003 – [Fairfield Greenwich] claims its due diligence is based on [employee name] at their firm checking the trade confirms that Madoff's broker dealer sends them. However, our point of view is that, since Madoff is self clearing, it could be making up its statements and tickets.

22

- February 26, 2004 – Although Tremont claims to receive access to Madoff's positions, the magnitude of the exposure and the truth of Tremont's transparency remain extremely disconcerting. . . . *The Madoff exposure is a potential disaster. Even though some products would not be directly affected . . . Tremont's products will still see their reputations vaporized when Madoff rolls over like a big ship.*

Rogerscasey Flash, December 2008 at 1-2 (Emphasis added).

90.     As Markopolos explained during his February 4, 2009 testimony before the House Committee on Financial Services, fund managers should have been able to determine that Madoff was a fraud based solely on the basis of analyzing options volumes trading volumes reflected in accounts were vastly in excess of actually reported trading volumes.  In particular, the S&P 100 Index options that Madoff purported to trade could not handle the reported trading volume.  A report from *Bloomberg* estimated that Madoff's strategy would have required at least 10 times the S&P 100 Index option contracts that traded on U.S. exchanges.  As the Markopolos' testimony explained:

> Markopolos: A lot of the victims thought that they were getting a highly diversified portfolio. . . .[Madoff] was purporting to own 30 to 35 of the bluest chip stocks, the largest companies in America. And they'd see that on their statements. And they felt very comfortable owning those companies, and they considered it a very diversified basket, because it really was a diversified basket.
>
> Rep. Ackerman: But there was nothing they could do to check it out, that he didn't actually buy it.
>
> Markopolos: You could.  As an individual investor you could not. *But as a feeder fund, you should have been able to go to the New York Stock Exchange and see that those volumes of that stock did not trade that day at that price.*  They could have gone to the Option Price Reporting Authority that the Chicago Board Options Exchange offers. And you would have seen that no OEX index options traded at those prices that day.

91.     Had Defendant conducted adequate due diligence into Madoff and Madoff Securities, it would have discovered at least some of the numerous flags identified herein.

92.     Even if Defendant did not fully uncover the horrendous truth surrounding the actual fraud, it should have concluded from the available evidence that investment results from Madoff-related could not be replicated or verified and were therefore inconsistent with the high duty of prudence required of fiduciaries and investment managers under ERISA. Defendant's failure to exercise adequate due diligence caused the Class Members to suffer substantial losses as a result of their investments with Madoff and Madoff Securities. Further, despite its duty of loyalty owed to the Plans, Defendant failed to adequately resolve conflicts of interest.

93.     Meanwhile, Defendant has been unjustly enriched in the form of unjustified management fees. Defendant collected substantial fees from the ERISA Plans. Such profits were made through use of the ERISA Plans' assets and must be restored to the ERISA Plans pursuant to Section 409(a) of ERISA.

94.     As Markopolos testified before Congress, because Madoff was only compensated through the commissions he charged from the trades he purportedly executed for his investors, funds-of-funds managers had a strong financial incentive to invest with Madoff. This is because such managers "were paid so much to look the other way." As Markopolos explained:

> To deliver 12 percent annual return, he needed to be earning a 16 percent gross, because there were four percent in fees...And he was passing the four percent in fees along to the feeder funds and keeping only a smidgen for himself. And so those feeder funds were incentivized not to ask the questions, to be willfully blind, if you will, and not get too intrusive into the Madoff scheme.

Testimony of Harry Markopolos before the House Committee on Financial Services, February 4, 2009 (hereinafter, "Markopolos Testimony").

95.     Essentially, dealing with Madoff meant that a fund manager was required to willfully abrogate his or her contractual and fiduciary obligations to the fund's investors in exchange for the benefits of highly consistent returns and the lucrative management fees that

flowed therefrom. Madoff only collected commissions on the purported trades he executed and thereby left a greater portion of assets from which fund managers collected their respective percentages of fees.

96.    As an ERISA fiduciary, Defendant was forbidden from disregarding its appurtenant obligations and being "willfully blind" in furtherance of increasing its own profits. To the detriment of the ERISA Plans, however, Defendant failed to conduct adequate due diligence and either ignored or inexcusably failed to recognize numerous red flags indicating that investing the ERISA Plans' assets with Madoff was imprudent.

## CLAIMS FOR RELIEF UNDER ERISA

97.    At all relevant times, Defendant was and acted as a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

98.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

99.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

100.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

101.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982). They entail, among other things:

        (a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of the plans' investments;

        (b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

        (c)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

102.    Section 502(a)(2) of ERISA specifically authorizes a plan fiduciary to bring an action for appropriate relief under ERISA § 409(a). Plaintiffs therefore bring this action under the authority of ERISA §502(a)(2) for class-wide relief under ERISA § 409(a) to recover losses sustained by the ERISA Plans arising out of the breaches of fiduciary duties by the Defendant for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets
(Breaches of Fiduciary Duties in Violation of ERISA § 404)**

103.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

104.    As fiduciaries, Defendant could not simply rely upon Madoff's reputation for producing consistent returns.  Rather, Defendant were obligated to (a) conduct complete and proper due diligence regarding the investment of the ERISA Plans' assets. (b) investigate any "red flags" or warning signs that the assets of the ERISA Plans were imprudently invested. and (c) take appropriate and adequate action, as necessary, to safeguard the ERISA Plans' assets.

105.    Defendant breached its duties to prudently and loyally manage the assets of the ERISA Plans that were invested with Madoff, regardless of whether such assets were invested with Madoff directly or indirectly, through the Tremont Core Strategies Portfolio or through separate accounts managed by Tremont.

106.    As described herein, Defendant failed to:

(a)    sufficiently investigate the Madoff-related investments to insure that they were a safe, prudent, honest and suitable investment for ERISA plans and their participants and beneficiaries;

(b)    recognize warning signs about the unreliability of Madoff-related funds as investment vehicles;

(c)    properly evaluate fund managers/submanagers; and

(d)    take action to protect the ERISA Plans' assets from foreseeable losses that would ensue. as Madoff's unsustainable, unlawful scheme hurtled toward its catastrophic end.

107.   Defendant breached its fiduciary duties to:

    (a)    take all reasonable steps to ensure that the investment of the assets of the Plans and the other Class Members were made and maintained in a professional and prudent manner;

    (b)    take reasonable steps in seeking to preserve for the Plans and the other Class Members the value of their investments;

    (c)    refrain from entrusting the assets of the Plans and the other Class Members to any fund manager whose interests were completely opposed to or otherwise in conflict with the interests of the Plans and the other Class Members; and

    (d)    perform all necessary due diligence and to remain attentive to ensure that the performance results of any fund in which the assets of the Plans and the other Class Members were invested were being accurately and timely reported, and to maintain oversight and transparency as to the activities of any fund manager that is investing any of the assets of the Plans and the other Class Members.

108.   ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

109.    Because ERISA specifically authorizes plan fiduciaries to sue for relief to a plan from breaches of fiduciary duty such as those alleged herein, this action is brought on behalf of the Plan and similarly situated ERISA plans, to remedy Defendant's breaches of fiduciary duties under § 404(a) of ERISA.

110.    Accordingly, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendant is obligated to restore losses to the ERISA Plans. As a direct and proximate result of Defendant's fiduciary breaches, the Plan and the other Class Members have suffered substantial losses and are entitled to recover such losses from Defendant, as well as a return of all fees paid to Tremont.

## COUNT II

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA § 404)

111.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

112.    At all relevant times, as alleged above, Defendant was a "fiduciary," within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, it was bound by the duties of loyalty, exclusive purpose and prudence.

113.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

114.    Tremont suffered from a conflict of interest in that it and its affiliates, including its Rye affiliate, collectively invested billions of dollars with Madoff for their clients, including financial institutions, public and private pension plans, ERISA plans, university endowments and

foundations and high net worth individuals. This was problematic, as divesting the Tremont Core Strategies Fund and other ERISA plan assets of their Madoff-related investments would have sent a negative signal to other Tremont clients and severely impacted the Tremont's reputation and bottom line.

115.    Tremont also suffered from an inherent conflict of interest in that it was compensated based on the fund's assets, including the phantom gains produced by Madoff and Madoff Securities.

116.    Further, upon information and belief, while investing the ERISA Plans' assets with Madoff, Tremont enjoyed the luxury of keeping a larger amount of fees than it otherwise would, as Madoff did not charge management or incentive fees. Divesting the ERISA Plans' Madoff investments and placing the assets with an authentic investment manager would have translated into much less revenue for Tremont. Thus, Tremont was disincentivized to adequately perform its fiduciary functions.

117.    For many years, Madoff and Madoff Securities produced positive and steady—though fraudulent—returns for their investors. Performing its fiduciary duties described herein—*i.e.*, conducting adequate due diligence, recognizing and investigating red flags and taking action to divest the Tremont Core Strategies Portfolio and the separate accounts of their Madoff-related investments—would have had the appurtenant effect of reducing Tremont Partner's management fees. Tremont, then, had a large cash incentive to "turn a blind eye" to the imprudence of the Madoff investments, at the risk of losses to the ERISA Plans.

118.    Tremont breached its duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the prudence of the Madoff-related investments.

119.    Tremont breach of its fiduciary duties was the direct cause of losses to the ERISA Plans.

120.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendant is obligated to restore the losses to the ERISA Plans caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that Defendant has breached its ERISA fiduciary duties to the ERISA Plans;

B.    An Order compelling Defendant to make good to the ERISA Plans all losses to the Plans resulting from Defendant's breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits Defendant made through use of the Plans' assets, and to restore to the Plans all profits which the Plans would have made if Defendant had fulfilled its fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.    Actual damages in the amount of any losses the Plans suffered;

E.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

F.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

G.    An Order for equitable restitution and other appropriate equitable relief against Defendant.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

31

Dated: January 13, 2010

Respectfully submitted,

Milo Silberstein (MS 4637)
**DEALY & SILBERSTEIN, LLP**
225 Broadway, Suite 1405
New York, NY 10007
Telephone: (212) 385-0066
Facsimile:  (212) 385-2117

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Peter H. LeVan, Jr.
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**CABLE, LANGENBACH, KINERK
 & BAUER, LLP**
Donald A. Cable
Lawrence R. Cock
1000 Second Avenue Bldg., Ste 3500
Seattle, WA  98104
Telephone: (206) 292-8800
Facsimile: (206) 292-0494

**Attorneys for Plaintiffs**